**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BRAYMAN CONSTRUCTION CORPORATION**<br>**1000 John Roebling Way,**<br>**Saxonburg, Pennsylvania 16056**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CBNA-HALMAR CLEAN RIVERS JV,**<br>**2 South Biscayne Boulevard, Suite 2000**<br>**Miami, Florida 33131**<br><br>**Defendant.** | * * * * * * * * * * * * * * * | **Civil Action No.** 1:26-cv-03497 |

******************************************

**COMPLAINT**

Plaintiff, Brayman Construction Corporation ("Brayman"), by and through its undersigned counsel, brings the instant Complaint against Defendant, CBNA-Halmar Clean Rivers JV ("CHJV"), and states:

**INTRODUCTION**

1. Brayman must bring this civil action to recover damages and obtain declaratory relief due to CHJV's multiple breaches of its written subcontract agreement with Brayman related to a construction project within the District of Columbia along the Potomac River.

2. Not only have CHJV's breaches caused Brayman to incur additional costs, but, because they include CHJV's repeated failure to supply Brayman with concrete that conforms to contractual requirements, these breaches also make it impractical, if not impossible, for Brayman to proceed with the project's next, and most complicated, phase.

3. As such, in addition to collecting significant damages, Brayman should be permitted to forego further work on the project due to CHJV's material breaches.

## PARTIES

4. Plaintiff, Brayman, is a corporation incorporated under the laws of the Commonwealth of Pennsylvania having its principal place of business located at 1000 John Roebling Way, Saxonburg, Pennsylvania 16056. Brayman is a citizen of the Commonwealth of Pennsylvania for purposes of 28 U.S.C. § 1332(c)(1).

5. Upon information and belief, Defendant, CHJV, is a joint venture whose two venturers are Civil & Building North America, LLC ("CBNA") and Halmar International, LLC ("Halmar"). CBNA is a limited liability company existing under the laws of the State of Delaware, having its principal place of business at 2 Biscayne Boulevard, Suite 2000, Miami, Florida 33131. Halmar is a limited liability company existing under the laws of the State of New York, having its principal place of business at 421 East Route 59, Nanuet, New York. Upon information and belief, CHJV is a citizen of the States of Delaware, Florida, and New York for the purposes of 28 U.S.C. § 1332(a).[1] Further, upon information and belief, neither CBNA nor Halmar are citizens of Pennsylvania for purposes of diversity of citizenship in this Court.

## JURISDICTION AND VENUE

6. This action arises under the laws of the District of Columbia, including but not limited to, the laws governing contracts.

---

[1] CBNA is a limited liability company with four (4) listed members. Giuseppe Folco and Jean-Pierre Margolin are domiciled in the State of Florida. Upon information and belief, Jacques Kimelfed and Vincent Avrillon are domiciled in the French Republic. Halmar is a limited liability company with four (4) listed members. Paul Atkins is domiciled in the State of New York. Itinera USA Corporation is incorporated in the State of Delaware with its principal place of business in the State of New York. Upon information and belief, Chris Larsen and Kristen Powers are domiciled in the State of New York.

7. This Court is authorized to award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds the sum or value of $75,000, excluding interest and costs.

9. Venue is further proper in this Court, pursuant to 28 U.S.C. § 1391, because the subject project is located in the District of Columbia, all of the acts complained of herein occurred in the District of Columbia, and the parties' underlying contract points to this Court as the proper forum for disputes under that agreement.

## FACTUAL ALLEGATIONS

### I. The Prime Contract and Subcontract.

10. The District of Columbia Water and Sewer Authority (the "Owner") and CHJV entered into a prime contract agreement (the "Prime Contract") with regard to the design and construction of the Potomac River Tunnel project (the "Project").

11. An approximately $819 million endeavor, the Project entails building a large-diameter deep sewer tunnel, diversion facilities, drop shafts, and other support structures to capture stormwater and sewage overflows before they pollute the Potomac River. As such, the Project has significant public and environmental interest.

12. Brayman and CHJV entered into a written subcontract agreement dated on or about July 8, 2024, whereby Brayman agreed to install certain Project support of excavation elements and concrete foundation piles in exchange for an original Subcontract price of $30,660,000.00 (the "Subcontract"). A true and accurate copy of the Subcontract is attached hereto and incorporated herein by reference as **Exhibit "A".**

13. The parties modified the Subcontract by ten (10) agreed-upon change orders for additional work totaling $956,640.53.

14. Brayman's scope of work on the Project included secant piles, sheet piles, vertical drilled piles, foundation piles, and micropiles (the "Work"). Brayman planned and priced the Work based upon the specified scope, quantities, sequencing, access, production assumptions, concrete requirements, and allocation of responsibilities contained within the Subcontract and the incorporated components of the Prime Contract.

15. Section 6 of the Subcontract governs changes to the Work between the Parties (entitled "Changes") and provides in pertinent part:

> "Any change or adjustment in the Contract price by virtue of such Change Order shall be specifically stated in said Change Order … Prior to the issuance of any Change Order, the Contractor may require the Subcontractor to furnish to the Contractor a detailed breakdown showing the difference in value of the work, labor, services, materials and equipment, added omitted or changed by the proposed Change Order. If an agreement as to monetary allowance or other term cannot be reached, the Contractor, by an authorized representative, may direct, in writing, the Subcontractor to perform the Work with the final adjustment reserved until Final Acceptance of both this Subcontract and the Prime Contract … Any extension of time strictly necessary as a result of a proposed Change Order shall be requested by the Subcontractor, in writing, prior to the issuance of the Change Order, and shall be incorporated therein."

*See* Subcontract § 6. Section 6 also provides methods to value Brayman's changed work, including documented time-and-material costs and approved contract unit prices for certain changes to the Work. *See id.*

16. Subcontract Section 11 (entitled "Delays in Performance and Damages to Others") entitles Brayman to additional time when it is delayed without fault of Brayman and by CHJV, entities for whom CHJV is responsible, or other specified causes and provides in pertinent part:

> "Should Subcontractor be delayed in the commencement, prosecution or completion of the Work without fault on its part and

> by reason of (i) delay caused solely by Contractor, or by Contractor's other subcontractors, suppliers, or other parties for whom Contractor is responsible, and but limited to the extent such delay is not concurrent with any other delay caused by Subcontractor or "Other Delay" as defined herein ("Contractor Delay") or (ii) causes which would entitle Contractor to an extension of time under the Prime Contract ("Other Delay"), then Subcontractor may be entitled to an extension of time in which to perform the Work which shall, in the case of Contractor Delay, be equal to the period of time Subcontractor is delayed in the performance of the Work by more than one day, unless otherwise prescribed in Attachment A, and in the case of Other Delay, be equal to the extension of time to which Contractor is entitled and granted by the Owner … In addition to the extension of time provided for herein, ***if such delay causes an actual verifiable direct cost increase in Subcontractor's cost of performance of the Work, Subcontractor may be entitled to an equitable adjustment in compensation payable pursuant to the terms of this Subcontract (a) in the case of Contractor Delay, for its verifiable direct cost increase incurred by Subcontractor, and (b) in the case of Other Delay, to the extent the Owner approves, grants and makes payment to the Contractor for such equitable adjustment.***"

*See* Subcontract § 11.1 (emphasis added).

17. Subcontract Section 22 (entitled "Payments") requires CHJV to pay Brayman timely upon submission of its payment applications and limits CHJV's withholding or retainage on such payments to the lesser of five (5) percent of each progress payment or the retainage the Owner withholds for Brayman's work, providing in pertinent part:

> "The Subcontractor shall become entitled to receive progress payments, for its work performed during the payment periods established in the Prime Contract. ***Contractor shall not withhold retainage in excess of the retainage withheld by Owner as to Subcontractor's Work*** … Always subject to the full compliance of the Subcontractor's Works with the terms and conditions of this Agreement, when the progress payments reach 50% of the Subcontract Price, the Contractor shall make the remaining progress payments in full without retainage…"

*See* Subcontract § 22 (emphasis added).

18. Subcontract Section 31.1 (entitled "Claims and Dispute Resolution") provides that "Subcontractor shall furnish notice to Contractor in writing of all claims for which it seeks additional compensation or an adjustment to the time of completion." Subcontract § 31.1.

19. Thus, the parties expressly agreed that should the parties fail to resolve a claim or dispute (or both) under Section 31, "all claims and disputes between Subcontractor and Contractor shall be resolved by litigation in the Courts of the District of Columbia." Subcontract § 31.6.

20. Subcontract Attachment "A" (entitled "Financial Provisions and Scope of Work") places responsibility for the concrete mix designs, a crucial component impacting the nature and pace of Brayman's Work, squarely on CHJV, establishes additional rates for obstruction drilling and pile crew standby time, outlines potential price adjustments, and identifies certain unit prices, amongst several other Project-related requirements and specifications. *See* Subcontract, Attachment "A" § 1.2, § 2.

**II. Concrete Mix Design.**

21. Under Subcontract Attachment "A", CHJV had responsibility for the mix design for any and all concrete Brayman would use in installing the concrete piles within Brayman's scope of Work. *See* Subcontract, Attachment "A" § 2, No. 5.

22. CHJV also had responsibility to provide the actual concrete for Brayman's Work, including installing secant piles, concrete facilities that extend from the surface to below ground.

23. Secant piles are installed in two phases: primary piles followed by secondary piles. Primary piles are placed in evenly spaced locations, after which the secondary piles would go into the spaces between the primary piles.

24. Brayman's Work included a critical step in this secant pile installation process—drilling secondary secant piles through concrete placed for the primary piles in the sequence contemplated by the Project's requirements (the "Concrete Drilling Work").

25. Brayman's Concrete Drilling Work entailed removing portions of the primary concrete piles to allow for pouring the secondary concrete piles in the space between the primary piles.

26. To perform such drilling according to industry standards, a contractor has to determine the proper means and methods for such work, which include size and type of the concrete drilling equipment to use, the power of such equipment, the size and type of the drill bit such equipment will use, any other necessary equipment, the pressures such drilling needs to exert on the concrete, the drilling techniques in using such equipment, the manpower needed, and the time to perform such drilling (the "Concrete Drilling Means and Methods").

27. Although each Concrete Drilling Means and Methods a contractor uses depends on the others—e.g., different techniques require different equipment—all of them depend on the type of concrete the contractor must remove, as concrete's composition and strength determines the equipment, techniques, manpower, and duration for such drilling.

28. The Concrete Drilling Means and Methods Brayman would use for concrete with a compression strength of 10,000 pounds per square inch ("psi") differs from that Brayman would use for concrete with a strength of 2,000 psi.[2]

[2] This necessary variation in drilling methods based on material characteristics occurs with all different types of materials in the construction industry and beyond. Drilling through pine requires a different drill bit and possibly drilling equipment than drilling through steel; similarly, cutting a cake differs from carving a turkey. In each, how the proverbial immutable laws of physics operate on a given material determine the equipment, techniques, and manpower needed.

29. In entering the Subcontract, Brayman determined the equipment, manpower, and time needed to perform this primary pile concrete drilling based on Project specifications and other requirements pertaining to the concrete to be furnished, in particular its strength.

30. In particular, the Subcontract provides that Brayman can determine its secant pile drilling "[p]roductivity rates are based on primary pile concrete strengths being a minimum of 500 psi at the time of drilling and no more than 2,000 psi at 2-7 days." Subcontract, Attachment "A" § 2, No. 5.a., Secant Piles, a).

31. On multiple occasions during the course of Brayman's secondary secant pile drilling at the Project, Brayman encountered primary pile concrete that exceeded the strengths Brayman anticipated and as set forth in the Subcontract, including concrete with compression strength of approximately 3,000 to 6,500 psi, and that failed industry standards for workability, stability, and strength gain versus time (the "Non-Conforming Concrete").

32. Upon encountering such Non-Conforming Concrete, Brayman promptly notified CHJV by way of a letter dated August 23, 2024.

33. This concrete's unexpected and contractually non-compliant strength significantly impacted the means and methods and pace of Brayman's work by impeding drilling activities, reducing Brayman's production, and damaging Brayman's tooling. *Id*.

34. On September 19, 2024, November 26, 2024, August 15, 2025, January 23, 2026, February 23, 2026, June 8, 2026, and September 24, 2026, among other instances, Brayman notified CHJV that due to repeated instances of Non-Conforming Concrete, including primary piles' concrete strength that did not match the Subcontract's requirements, CHJV had continuously breached the Subcontract.

35. As CHJV worked on revising Project concrete mix designs, it directed Brayman to abandon multiple concrete pours and suspended other placements. In response, Brayman recorded data for, or otherwise preserved, the resulting time and costs impacts and provided them to CHJV for review and response.

36. Even though Brayman communicated with CHJV multiple times about the nonconforming concrete's effect on Brayman's performance, CHJV has failed or refused to address or otherwise respond to the impacts Brayman has suffered due to the improper concrete mix CHJV supplied to the Project.

37. Although CHJV attempted, through other subcontractors and vendors, including a new concrete supplier, to deliver a concrete mix within the Subcontract's requirements and the Project's specifications, to date CHJV has never furnished a concrete mixture that complies with the Subcontract's requirements.

38. CHJV's failure to furnish a contractually compliant concrete mix, or demonstrate it can do so, precludes Brayman from performing future work, in particular the next phase of Brayman's work under the Subcontract, secant pile installation at a Project location known as Site 24.

39. CHJV expects Brayman to begin Work at Site 24 on or around November 9, 2026 (the "Site 24 Start Date"), but, to date, CHJV has neither shown Brayman that it has procured a contractually compliant concrete mixture nor demonstrated that CHJV will have such a mixture approved for use at the Project by the Site 24 Start Date.[3]

[3] CHJV must obtain the Project engineer's approval for any concrete mix design used on the Project, a process that has taken over ten weeks in the past.

40. Work on Site 24 also requires certain specialized, custom-designed and -ordered equipment, to account for low-overhead restrictions for Brayman's Work in this area; therefore, should CHJV again furnish non-compliant concrete, such improper material could impact Brayman's Work, including the projected pace of performance, more dramatically than before or even make such Work impossible to perform.

41. Brayman notified CHJV in a letter dated March 25, 2026 that Brayman cannot commence work on Site 24 unless CHJV demonstrates that it will provide concrete that meets the Subcontract and other Project requirements; otherwise, Brayman will have nearly insurmountable constructability issues. Thereafter, Brayman provided verbal notices of this issue on April 2, 2026 and June 16, 2026, and provided yet another written notice on September 24, 2026.

42. Because CHJV has yet to demonstrate it can meet its contractual obligation to furnish to the Project the proper concrete mix for Brayman to install as its Work requires, not only has CHJV caused Brayman to incur significant delays, costs, and other impacts, but it has also failed to fulfill an obligation fundamental to Brayman performing its secant pile concrete drilling and doing so in accordance with the expected labor, materials, and equipment required for such work.

**III. Standby Time.**

43. Commencing in July 2024, concrete-related delays interrupted Brayman's planned secant pile operations at the WPP OMS Project site (the "WPP OMS site"). Although Brayman had mobilized its labor force and equipment to perform its Work as scheduled and as the Subcontract required, Brayman could not proceed with such Work because CHJV delayed supplying the necessary concrete and Brayman notified CHJV of such delay by way of a letter dated May 10, 2025.

44. CHJV's failure to provide concrete further interrupted Brayman's work at the WPP OMS site from August 2024 through November 2025 and subsequently impacted Brayman's planned work at the WPP TMS Project site (the "WPP TMS site") from November 2024 through February 2025. While waiting for CHJV to provide such concrete, Brayman maintained its labor forces and equipment for the planned operations, as the Subcontract required and as Brayman expected, and Brayman documented its impacts to CHJV by way of letters dated August 26, 2025 and August 20, 2026.

45. At the WPP OMS site, CHJV cancelled additional concrete pours even after Brayman had already begun initial placements. Those cancellations by CHJV caused further standby delays and required Brayman to replace reinforcing cages, address damaged tooling, and repeat site preparation work. Brayman documented these impacts and notified CHJV of them by way of a letter dated August 27, 2026.

46. From January 2025 through April 2025, CHJV failed to provide design drawings for layout or failed to ensure adequate site access or coordination (or both) so that Brayman could continuously install sheet piling at the Project from May through July 2025, thus further interrupting Brayman's Work. Brayman documented all of these CHJV obstruction-related impacts by way of letters dated May 23, 2025, July 10, 2025, June 23, 2026 and August 17, 2026.

47. From February through May 2025, Brayman incurred significant standby time for its foundation pile crew. Brayman formally documented the impacts it incurred by way of letters dated July 1, 2025, November 14, 2025 and January 28, 2026.

48. From May through September 2025, due to blasting shutdowns, further interruptions to the concrete supply, and survey delays, Brayman's labor force could not perform

its Work as scheduled. Brayman recorded and submitted these standby periods to CHJV by way of a letter dated November 19, 2025.

49. Between June and November 2025, because CHJV failed to supply concrete continuously, regularly, or consistently, Brayman's secant pile crews could not proceed as scheduled at the CSO-022 and CSO-028 Project sites. Brayman recorded and submitted the resulting standby periods to CHJV by way of a letter dated January 7, 2026.

50. CHJV's continued delays in furnishing concrete interrupted or delayed Brayman's secant pile installation at the CSO-022 site from November 2025 through March 2026. Brayman maintained its labor force for that work and recorded the resulting standby by way of a letter dated May 7, 2026.

51. In April 2026, CHJV initiated a shutdown that delayed Brayman's mobilization at CSO-028. Brayman documented and submitted the resulting costs to CHJV by way of a letter dated May 4, 2026.

52. At the WPP TMS site, CHJV installed a working platform that, for some portions, lacked adequate bearing capacity when initially loaded, and Brayman could not perform its planned Work in those areas until CHJV repaired the platform. Brayman recorded the resulting standby and submitted to CHJV by way of a letter dated August 20, 2026.

53. Brayman formally documented and substantiated the number of standby hours incurred at the WPP TMS due to a CHJV-controlled delay that prevented the commencement of Brayman's secant pile installation by way of a letter dated August 13, 2026.

54. In April 2026, Brayman experienced delays outside of its control at CSO-028 during the drop shaft guidewall installation. Brayman documented the resulting standby and submitted to CHJV by way of a letter dated July 27, 2026.

55. At CSO-022, the Owner suspended secant pile drilling because the drilling noise exceeded permissible levels. Work could not resume until noise mitigation measures were implemented, which were specifically excluded from Brayman's scope of Work under the Subcontract. *See* Subcontract, Attachment "A" § 2, No. 5.c., Exclusions from Subcontractor's Work, No. 24. Brayman documented its costs associated with these noise mitigation measures to CHJV by way of a letter dated August 14, 2026.

56. Brayman performed additional secant pile work at CSO-028 through September 2026. Brayman recorded the labor, equipment and materials for that additional work on a time-and-material basis and transmitted this information to CHJV by way of a letter dated September 14, 2026.

57. At CSO-022, CHJV's inclinometer movement interrupted Brayman's drilling operations. Brayman documented the resulting impacts and notified CHJV of the associated costs by way of a letter dated August 19, 2026.

58. At CSO-029, CHJV evaluated test pits and alternative designs and directed Brayman not to mobilize equipment or materials while that evaluation continued. To minimize the resulting cost, Brayman used internal trucking and then documented the remaining impacts for CHJV by way of a letter dated August 27, 2026.

59. Therefore, during the delays and interruptions to Brayman's Project Work, Brayman had a labor force and equipment available as the Subcontract required, but Brayman could not perform the Work for which it had mobilized. Brayman promptly recorded and submitted to CHJV the precise total hours and days CHJV's delays kept Brayman idle and thus the corresponding standby costs mandated by the Subcontract.

60. Even though Brayman could recover its full standby costs for these standby times, Brayman nonetheless relocated its workforce and equipment to perform other Project work, often outside Brayman's scope of Work under the Subcontract. Although CHJV initially accepted Brayman's efforts to minimize the impact of standby costs, CHJV now asserts—years after the fact—that Brayman performed such work for compensation on a time and materials basis and in exchange for forfeiting the standby costs to which Brayman was entitled under the Subcontract, despite no writing memorializing such an agreement or oral communication confirming it.

**IV. Changed or Additional Project Work.**

61. In addition to incurring costs for standby time, Brayman performed Work and incurred costs on the Project arising from unforeseen conditions or requirements outside of Brayman's scope of Work under the Subcontract.

62. In October 2024, CHJV directed Brayman to install four additional piles tangent to the secant pile wall at the WPP OMS site. However, those piles required additional drilling and corresponding installation work outside of the Subcontract's scope of Work. Brayman documented and submitted the associated costs to CHJV by way of a letter dated September 10, 2025.

63. In January 2025, abnormal and unforeseen site conditions affected Brayman's construction of secant piles at the WPP TMS site. Specifically, at piles P157, P159 and P161, Brayman had to excavate previously-placed concrete and place new concrete. Brayman documented and submitted these costs to CHJV by way of a letter dated September 11, 2026.

64. Beginning in August 2025, Brayman completed its scope of Work on the foundation piles utilizing only one (1) drill rig, contrary to Brayman's expectation under the Subcontract's unit pricing. Brayman documented the affected soil and rock quantities and notified CHJV of the resulting cost adjustment by way of a letter dated October 20, 2025.

65. On April 29, 2026, Brayman submitted an estimate for increased materials costs for vertical pipe casing at CSO-020 and CSO-027 due to materials price escalations. Brayman requested an adjustment to its compensation by way of a letter and additional documentation dated August 20, 2026.

66. In May 2026, Brayman conducted water-flow tests in a dewatered foundation pile excavation, the results of which led to Brayman filling excavated shafts to specified water levels before placing the concrete outlined in its scope of Work under the Subcontract. Brayman documented the additional testing and preparation to CHJV by way of a letter dated August 17, 2026.

67. On June 30, 2026, Brayman notified CHJV of additional work that was obstructed at CSO-028 and recorded the affected drilling and its associated costs in the obstruction submission transmitted to CHJV by way of a letter dated June 30, 2026 and additional documentation.

68. Other changed conditions affected Brayman's secant pile work at the WPP OMS and TMS sites. At the WPP OMS site at pile SP23 (S46), Brayman encountered conditions requiring work beyond its planned installation under the Subcontract. At the WPP TMS site, Brayman encountered an obstruction and abnormal water infiltration during drilling and concrete placement. Brayman documented its resulting costs from these impacts to CHJV by way of a letter dated May 8, 2026.

69. At CSO-022, CHJV erected and moved a temporary bridge, activity that disrupted Brayman's continued operations. CHJV also configured the bridge in a way that restricted access to Brayman's secant pile work, which reduced Brayman's drilling efficiency. Brayman documented the resulting impacts by way of a letter dated June 2, 2026.

70. At CSO-028, CHJV orally directed Brayman to extend certain casing beyond the top of rock to elevations identified in the boring reports. The additional casing and rock work affected Brayman's Work for the CSO-028 drop shaft. Brayman documented the costs for the extra work for CSO-028 and notified CHJV of those costs by way of letters dated November 5, 2025, November 14, 2025 and October 2, 2026.

71. Brayman also notified CHJV that by requiring sheet pile toe grouting below the Subcontract's 20 gpm refusal criterion, CHJV would change Brayman's work. Brayman preserved its request for additional time and compensation and notified CHJV of such remedies by way of a letter dated July 24, 2026.

72. At CSO-022 Drop Shaft Secant Pile and CSO-022 NSS Secant Pile, Brayman formally documented and substantiated and compiled an obstruction log and notified CHJV of those costs by way of a letter and documentation dated May 12, 2026.

73. Brayman formally documented and substantiated the payments received for underrunning the planned quantities. As outlined in Subcontract, Attachment "A," Brayman is entitled to payment for these contracted quantities, despite the actual quantities falling below such contracted amounts. *See* Subcontract, Attachment "A," § 1.1 ("Notwithstanding the above, it is agreed that Subcontractor can retain the savings for underrunning the total neat quantity up to 15% at WPP site only"). Brayman provided CHJV notice by way of letters dated September 5, 2025, November 11, 2025, December 15, 2025 and January 27, 2026.

74. Last, at CSO-027 and CSO-028, Brayman notified CHJV of extended rock drilling lengths requiring equitable adjustments to complete its secant pile installations at both sites, by way of letters dated October 2, 2026.

75. Brayman notified CHJV of the changed conditions and additional work described above, submitted the corresponding records and requests, and sought adjustments for the time and cost outside of its original scope—all in accordance with the Subcontract, including its required notice provisions.[4] Even though Brayman met its obligations under the Subcontract for compensation for extra-scope Work, CHJV has failed or refused to pay the outstanding amounts due and owing under the Subcontract.

**V. Withheld Payments and Retainage, Notice of Claim, and Continuing Dispute**

76. CHJV withheld $94,244.95 from Brayman's Invoice No. 24, $47,021.30 from Invoice No. 25, $56,069.95 from Invoice No. 26, and an unknown amount from Invoice No. 27 for a present total of $197,336.20 in disputed payments. Brayman contends that the Subcontract entitles it to these payments based on the quantities measured under Section 6 and Attachment "A." *See* Subcontract §§ 6; 22; *see also* Subcontract, Attachment "A" §§ 1.2 2.

77. CHJV also withheld retainage owed to Brayman of $9,310.70 on Brayman's Invoice No. 22, $28,233.11 on Invoice No. 23, $41,620.89 on Invoice No. 24, $56,843.91 on Invoice No. 25 and $109,221.29 on Invoice No. 26 for a total of $245,229.90. Brayman asserts that CHJV wrongfully withheld retainage in violation of the parties' Subcontract, which mandates releasing retainage unless held by the Owner. *See* Subcontract § 22.

78. Brayman provided contemporaneous notice of the events identified above, then consolidated its outstanding requests in a July 31, 2026, claim submission (the "Initial Claim"). Brayman recorded the affected work in daily reports, drilling logs, time-and-material tickets, invoices, correspondence, and cost summaries, amongst other backup documentation.

[4] Brayman has notified CHJV of certain additional claims that it is still in the process of compiling its damages for, including but not limited to the following: 1.) CSO-028 Site DS Rock vs. "DR"; 2.) CSO-028 DS Top of Rock Difference; and 3.) CSO-28 NSS Extended Rock Drilling Length.

79. On September 22, 2026, Brayman supplemented its claim submission (the "Supplemental Claim") and included a damages schedule totaling the aforementioned quantified losses at or around $5,763,008.93. This damages figure (a) does not account for the impacts associated with the defective concrete mix and (b) remains subject to reconciliation against the underlying cost and payment records.

80. Despite Brayman's prompt notices and requests, as the Subcontract requires, CHJV has not paid any of the certain amounts Brayman asserts are currently due and owing.

81. Additionally, Brayman asserts that CHJV wrongfully withheld payment and retainage amounts due Brayman pursuant to the parties' Subcontract.

82. CHJV's ongoing breaches have damaged Brayman in an amount presently calculated at $5,763,008.93. However, the losses to Brayman continue to mount, while interest on outstanding amounts will continue to accrue.

## VI. CHJV's Material Breaches of the Subcontract

83. By failing to provide the proper concrete mixture under the Subcontract, by failing to provide concrete to Brayman when needed to install piles, and by failing to compensate Brayman for unexpected costs and extra-scope work, CHJV materially breached the Subcontract.

84. Brayman determined the equipment, time, labor, and material needed to perform its work based almost entirely on the concrete mix design it expected CHJV to provide in accordance with the Subcontract.

85. Thus, Brayman relied on CHJV to deliver concrete that conformed with the Project specifications.

86. When CHJV did not provide the mix design that the Project documents required, CHJV's failure disrupted almost every aspect of Brayman's work.

87. CHJV also failed to fulfill its essential obligations under the Subcontract by:

a. failing to pay Brayman's pending change order requests or negotiate them promptly and in good faith;

b. failing to release certain retainage upon Brayman completing over 50% of its work, as the Subcontract requires;

c. failing to pay any of the standby costs owed due to concrete delivery delays based on alleged 2-hour limitation that CHJV ultimately conceded did not exist; and

d. paying only a small portion of the savings owed to Brayman as underruns, despite acknowledging the full amount owed.

## COUNT I
## (Breach of Contract)

88. Brayman hereby adopts and incorporates by reference the allegations contained in Paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89. Brayman and CHJV entered into a valid, binding and enforceable contract, the Subcontract, which required CHJV, among other things, to provide concrete mix designs that complied with the Subcontract's requirements, compensate Brayman for changes in and additions to its Work, timely pay amounts due under Brayman's payment applications, and release retainage in accordance with the requirements of the Subcontract.

90. At all times relevant hereto, Brayman has fully complied with all of its material obligations under the Subcontract.

91. CHJV has breached its contractual obligations to Brayman by failing to provide concrete mix designs that complied with the Subcontract, failing to compensate Brayman for changes in and additions to the Work, failing to timely pay amounts due under Brayman's payment applications, and failing to release retainage when due in accordance with the requirements of the Subcontract.

92. As a direct, proximate, and foreseeable result of CHJV's multiple breaches of its obligations under the Subcontract, Brayman has suffered damages and losses and will continue to suffer damages and losses during the pendency of this litigation.

**COUNT II**
**(Unjust Enrichment)**

93. Brayman hereby adopts and incorporates by reference the allegations contained in Paragraphs 1 through 87 of this Complaint as if fully set forth herein.

94. Brayman provided valuable services to CHJV for the benefit of CHJV.

95. CHJV is retaining the benefit of Brayman's services.

96. Under the circumstances, CHJV's retention of the benefits provided by Brayman is unjust, and Brayman has suffered damages and losses and will continue to suffer damages and losses during the pendency of this litigation.

**COUNT III**
**(Declaratory Judgment Pursuant to 28 U.S.C.A. § 2201)**

97. Brayman hereby adopts and incorporates by reference the allegations contained in Paragraphs 1 through 87 of this Complaint as if fully set forth herein.

98. This is a claim for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

99. Under the express terms of the Subcontract, CHJV is required to, amongst other things, provide concrete mix designs that complied with the Subcontract's requirements (including within the appropriate strength tolerances), compensate Brayman for changes in and additions to its Work, timely pay amounts due under Brayman's payment applications and release retainage in accordance with the requirements of the Subcontract.

100. CHJV repeatedly failed to provide concrete mix designs that complied with the Subcontract, failed to compensate Brayman for changes in and additions to the Work, failed to timely pay amounts due under Brayman's payment applications and failed to release retainage when due in accordance with the requirements of the Subcontract.

101. In particular, because Brayman has Work remaining on the Project, including its portion of Work on some of the Project's most complicated aspects, such as Site 24, Brayman should not be forced to continue providing labor, equipment, and services without appropriate compensation and without a guarantee to receive a concrete mix that complies fully with the Subcontract.

102. Forcing Brayman to continue to work on the Project, while CHJV supplies out of specification concrete that leads to inefficiencies, delays, and other harm to Brayman, violates the Subcontract and would make it impossible for Brayman to fulfill its obligations under that agreement.

103. Moreover, CHJV's perpetual provision of out of specification concrete constitutes a material, uncured breach of the Subcontract.

104. An actual and justiciable controversy exists between Brayman and CHJV concerning CHJV's performance of its obligations under the Subcontract.

105. The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

106. Brayman seeks a judicial determination that CHJV's breaches of the Subcontract are material and excuse Brayman from further performing its obligations under the Subcontract and the Project.

## RELIEF REQUESTED

WHEREFORE, by reason of the foregoing, Plaintiff, Brayman Construction Corporation, respectfully requests that this Court:

(a) award compensatory damages to Brayman in an amount greater than $75,000.00, plus interest, costs and such other relief as may be just and appropriate;

(b) declare that CHJV has committed material breaches of the Subcontract and that Brayman is entitled to be excused from further performing its obligations under the Subcontract and on the Project, including, but not limited to, those for Site 24, to the extent such obligations depend on CHJV furnishing concrete to the Project that complies with the Subcontract and Project design documents; and

(c) grant Brayman such other and further relief as this Court may deem just and proper.

Dated: October 6, 2026

Respectfully Submitted,

*/s/ Ian A. McLin*
Ian A. McLin (D.C. Bar No. 1602490)
SAUL EWING LLP
1800 M Street, NW, Suite 1000 North
Washington, DC 20036
(202) 295-6604 – Telephone
(202) 337-6065 - Telefax
ian.mclin@saul.com

Michael J. Joyce (*pro hac vice* forthcoming)
SAUL EWING LLP
One PPG Place, Suite 3010
Pittsburgh, PA 15222
(412) 209-2539 – Telephone
(412) 209-2570 – Telefax
michael.joyce@saul.com

Michael Metz-Topodas (*pro hac vice* forthcoming)
Emily Martin (*pro hac vice* forthcoming)

SAUL EWING LLP
1735 Market Street, Suite 3400
Philadelphia, PA 19103
(215) 972-7739 – Telephone
(215) 972-7725 – Telefax
michael.metz-topodas@saul.com
emily.martin@saul.com

*Counsel for Plaintiff Brayman Construction Corporation*